The Grievance Committee of the Birmingham Bar Association charged James H. Dodd, Attorney at Law, with five violations of the Disciplinary Rules of the Code of Professional Responsibility; the Code of Professional Responsibility is found at 293 Ala. XXIII. The Board of Commissioners of the Alabama State Bar Association found Dodd guilty of Charges III and IV and suspended him from the practice of law for 60 days. We reverse the finding of guilty as to Charge III and affirm as to Charge IV.
On January 24, 1974, Kathy Ann Shew, a minor 18 years of age, was involved in an accident. In February of 1974 Doris Shew Myers, mother of Kathy, employed Dodd to represent her and Kathy in a claim for injuries to Kathy in the January accident. Dodd filed suit in March, 1974, and settled the case on approximately December 5, 1974.
Charge III alleges violation of DR 5-106 (A), DR 6-101 (A) and DR 7-101 (A)(2). The substance of that charge is that Dodd settled the law suit without the knowledge and consent of Doris Myers. DR 5-106 (A) reads as follows:
"DR 5-106 Settling Similar Claims of Clients.
 "(A) A lawyer who represents two or more clients shall not make or participate in the making of an aggregate settlement of the claims of or against his clients, unless each client has consented to the settlement after being advised of the existence and nature of all the claims involved in the proposed settlement, and of the participation of each person in the settlement.
. . . . .
"DR 6-101 Failing to Act Competently.
 "(A) A lawyer shall not willfully neglect a legal matter entrusted to him.
. . . . .
"DR 7-101 Representing a Client Zealously.
"(A) A lawyer shall not intentionally:
. . . . .
 "(2) Fail to carry out a contract of employment entered into with a client for professional services, but he may withdraw as permitted under DR 2-111, DR 5-102, and DR 5-105."
Charge IV alleges violation of DR 7-101 (A)(2) (above). Dodd is alleged to have entered into an unenforceable contract when he agreed to represent Kathy for 50% of any recovery. He allegedly entered into a contract for 30% of the recovery when the mother, Doris Myers, employed him to represent her and Kathy.[1] *Page 702 
The testimony in the record was taken before a Commissioner and was then submitted to the whole Board for decision. The testimony was not taken orally before the triers of fact. We therefore review the evidence without any presumption in favor of the findings of the Board. Ex parte Acton, 283 Ala. 121,214 So.2d 685 (1968); Smiley v. Board of Commissioners of AlabamaState Bar, 286 Ala. 216, 238 So.2d 716 (1970). Tit. 46, § 25, Code of Alabama 1940, Recompiled 1958.
The burden of proof is upon the State Bar, and the defendant is presumed innocent. Board of Commissioners of Alabama StateBar v. Jones, 291 Ala. 371, 281 So.2d 267 (1973); In reCarroll, 287 Ala. 29, 247 So.2d 350 (1971). The applicable degree of proof and rules of evidence are those which apply to civil cases. Code of Professional Responsibility, supra, Section B, Rule 22. In reviewing the testimony only relevant, material or competent evidence is to be considered, regardless of whether objection was made to the testimony. Id., Rule 18.
 TESTIMONY
Dodd was unable to locate the contract between himself and Doris Shew Myers; Doris did not receive a copy. According to Doris, the agreement was that Dodd would handle the claim on a contingency basis for 30%, that Doris would get 20%, and that Kathy would get 50%. Dodd claims that the contract was for 35% to 40% contingency, but if filed or tried, then for 50% contingency.
As time progressed, Dodd became aware that things were not well between Kathy and her mother. At the time of the accident Kathy had not been living at home, but rather with some friends, Sue and Jimmy Waddell. After the accident, Kathy lived with an older sister, Janice, for a couple of weeks and then lived with an older step-sister[2] and her husband, Nancy and Kenneth Jackson. After the settlement, Kathy bought a house. According to Kathy, she had not lived at home except for short periods for the 3 years prior to the accident.
Kathy spent approximately 1 month in the hospital during which time Doris, by her own testimony, visited her only during the first 3 days. Sue and Jimmy Waddell, who were at the hospital frequently, saw Doris there only the evening of the accident. At the hospital, both Doris and Herman refused to be responsible for any of the bills. Jimmy Waddell finally signed for the ambulance, and Kathy appears to have taken responsibility for the rest of the bills.
At the time Dodd was handling the case, he did not fully realize the reasons for the rift between Kathy and her mother, but did realize its existence. From the evidence presented in this proceeding, the rift was caused by Herman's actions. According to Kathy, he raped her when she was 12. He also allegedly attempted to rape or molest other stepdaughters (Nancy and Toni Lynn), and Sue Waddell before she was married, and a neighborhood girl. In brief, the Board readily stipulates that Herman is an unsavory character. When Doris was told of the attempts on the daughters, she believed Herman's denials. According to Kathy, Nancy and Nancy's husband, Kenneth Jackson, Doris is afraid of and controlled by Herman.
At some time in the Fall of 1974, Kathy, supported by Nancy and Kenneth, asked Dodd to have her "declared 21," or in other words to have her disability of non-age removed. We quote from the record:
 "Q. And it was your idea that to have your disabilities of non-age removed so you could handle it, didn't you?
"A. Yes, sir. *Page 703 
 "Q. I'll ask you if you knew the way your mother and her husband were living, the type of life and character of life that they were living at that time?
"A. At that time?
"Q. Yes ma'am.
 "A. They got drunk a lot. They argued a lot. I didn't like being around them, and I just, at that time, I just wanted them to leave me alone, personally, the way I felt.
 "Q. I'll ask you also had the opinion that if the money went to your mother that they would squander it and you would never see any of it?
"A. That's the way I felt, yes, sir."
Prior to that time, according to Nancy, her mother had told her that Kathy should receive everything because she is the one who suffered. According to Nancy, Doris was different when not with Herman.
On November 8, 1974, Dodd went to see Doris at her home to obtain her signature on a petition to remove Kathy's disability of non-age. According to Doris and Jerry Wayne Shew, Dodd's visit was brief. He allegedly told her to hurry up and sign the paper so she would get her 20%. According to Dodd, he fully explained the petition, that she did not have a valid claim for medical expenses or loss of services, and that thereafter he would be solely representing Kathy.
After obtaining Doris' signature and filing the petition with the probate court, Dodd on that same day entered into a second contract with Kathy for 50% "in the event that suit is filed or tried . . ."; no other percentage was given. Dodd had already filed suit in March in the name of Doris Shew Myers, individually, and in Kathy's name, with Doris as next friend. See Tit. 7, § 102. Rule 17 (c), ARCP.
Thus, according to Dodd this did not represent an increase in fee because the first contract was for 50% if filed or tried, and suit had already been filed.
Dodd's testimony as to the second contract was impeached by his prior testimony before the Grievance Committee, taken approximately 6 months earlier, and by what he reportedly told a character witness. We quote from the record:
"Q. So your recollection of the terms of the contract with Mrs. Myers in March or April of '74 is based upon your memory, is it not, Mr. Dodd?
"A. Yes, sir.
"Q. I want to refresh your recollection by making reference to some of your statements before the Grievance Committee of the Birmingham Bar Association on June the 6th, 1975, and this question was asked you, and I'm reading from page 126 of this transcript, a copy of which I believe I furnished to Mr. Tweedy. The question was asked, `Did you talk to the mama about your fee arrangement? And your answer was, `Yes, a fee, if Cathy [sic] went along with it. I don't mean the fee, but if she were would [sic] agree to let me handle it — you get a kid eighteen years old, and I say again, from what they told me, it sounded like a good case, and I was trying to control everybody if I could. That is as fair a statement as I know how to put it. I wanted the case, and at the same time, of course, I wanted the best fee arrangement I could get, and I don't recall exactly what the fee arrangement was. It would have been between either thirty-five or forty percent, somewhere in that neighborhood.'
"MR. TWEEDY: It said, `It would have been either thirty-five or forty percent.'
"MR. MORROW: I'm Sorry. `It would have been either thirty-five or forty percent, somewhere in that neighborhood.'
"A. If I — that would have been if I could finish that statement, that would have been short of suit, or fifty percent if suit were filed.
"Q. Well, did you so testify at that time?
"A. I don't remember what —
"Q. All right, and then you were questioned about this contract which has been offered as Exhibit `8' that you got Cathy Ann Shew to sign on November the 8th, 1974.
"A. Yes, sir. *Page 704 
"Q. For fifty percent, and you were asked this question on page 135, `How did you arrange — you said frankly your fee was to be thirty-five or forty percent, and then you later handled it on the basis of fifty percent. How did you handle that? Answer: There was no handling to it, Jack, I just simply, like I am with all of my clients. This is a new client, and I got the best cotton picking contract I could get. And, to me, here is a new client with a new horizon, and a new case, as far as I am concerned. This party could have walked out of the probate judge's office up there and said, `Well, I am, you know, fine. I can go get me another lawyer to pursue this matter', and that is the position I took in it right or wrong, and I still think she could have done that. I think the only thing that any lawyer has in any of the contracts is nothing but a point of merit, and the question then is trying to get the thing up and proceeding immediately with the thing.' Do you recall that testimony?
"A. Yes, sir.
"Q. And then further in your questioning, or our answer to that, I'm quoting from page 136 of your testimony, `I never thought in terms of trying to explain why my original was thirty-five or forty, and the final one fifty. I never considered that to have any bearing in this case at all. That is the position I am taking now, and the position I took then.' Do you recall so testifying? "A. I have read that. I didn't realize it came out just exactly like that is being said. I, in my own mind, was thinking I was saying all the time that this was short of suit.
"Q. Now, are you testifying here today, Mr. Dodd, that you did not, by getting this minor, well, her disabilities were removed on November 8th, to sign this contract, which is Exhibit `8', are you testifying here today that that in no way increased your fee over and above the contract you had signed with her mother on March or April of '74?
"A. No, sir, it did not, and after I have had a moment to think in terms of what the original contract was, I realize there was no increase at all.
"(Short off-the-record)
"Q. All right. Now, on page 202 of your testimony, I want to ask you this. I want to read this question and your answer.
`MR. BAINBRIDGE: I have just one question, Jim, and we will let you go. It's late. Is it fair to say under any condition the fee that you recovered under the November the 8th contract, the fifty percent, was more than the fee you would have gotten under the first contract without a trial? Answer: I think so, yes.' Were you testifying truthfully to Mr. Bainbridge in that answer on June the 6th, 1975?
"MR. TWEEDY: I want to object to that form of the question and reserve the right to place grounds later on as to the competency of the answer.
"A. I would say that based upon what my recollection was then in reference to the contract, I was just thinking — I wasn't really sure. When you've got fourteen men that are popping questions at me there for an hour and a half, at what stage, some of the things came out. I didn't realize I really said that."
 . . . . .
"MR. MORROW: I'm on page 155, and this question was asked, `Question: In the contract that you can't locate right now, do you recall what percentage recovery you were to get before trial or after trial? Answer: My recollection is thirty-five and fifty if it's tried. Question: You say that the contract was signed with Mrs. Myers? Answer: Mrs. Myers. I know Mrs. Myers signed it, but I'm not sure whether anybody else did.' Now that testimony was taken closer to the event. Is it your recollection now that you were incorrect when you stated that the contract provided thirty-five percent and fifty percent if tried?
"A. Yes, sir, I thought I had said, if filed, and — "Q. Everywhere you've said tried that I've quoted from, did you mean to say filed? *Page 705 
"A. I thought that I had said filed in my contract. The only one that I was using at this particular time says filed or tried, and I didn't realize it was coming out tried every time. I'm sorry, but I just didn't realize it.
"MR. TWEEDY: Where is that exhibit `8', I think. The contract is what it is.
"MR. MORROW: The November the 8th contract?
"MR. TWEEDY: Yes. I just wanted to call your attention to the fact that this one says `if filed or tried'.
"A. That's the same type that Mrs. Myers signed, and I don't know why it kept coming out tried. I felt I was saying filed."
Judge James O. Haley, who testified as a character witness for Dodd, related what Dodd told him:
"Q. Do you have any knowledge of the facts that resulted in the Grievance Committee filing disciplinary charges against Mr. Dodd which is the subject matter of this hearing?
"A. Not except that Mr. Dodd himself told me.
"Q. And what was that?
"A. Basically, the salient facts, as I recall, were that he had a contract with the mother of this seventeen-year-old girl to represent the mother and the girl in a damage suit and that he had a contract by which he was going to get a third of the recoveries as fee. The girl became eighteen years of age, and he had the disability of non-age removed and renegotiated a contract and got a contract, as I recall, for half and later settled the case and collected his fee.
"MR. MORROW: That's all."
Dodd settled the case with the insurer on approximately December 5, 1974, for $37,000. The insurer obtained a release from Kathy, but never requested one from Doris. In Kathy's opinion, Dodd's handling of the case was excellent:
"MR. TWEEDY: You said you want to say something else. What do you want to say?
"MR. MORROW: Go ahead, Cathy. Go ahead and say it.
"THE DEPONENT: I said that Mr. Dodd did a good job. I got no hard feelings toward him. I think he did a good job. He did it in a fast time, which is the way I wanted it, and he never did nothing on his own, what he did was what I told him to do for me and that's all."
Doris later questioned Kathy about the suit and became aware of the settlement; Kathy had asked Dodd not to tell her mother, but rather to let her tell her, and Dodd referred Doris to Kathy when she came to Dodd's office.
Doris thereafter filed a complaint with the Grievance Committee. Upon learning of the complaint, Dodd went to Doris to attempt to settle the dispute. Doris agreed, reluctantly according to her testimony, to accept $150 in cash and $250 to $350 in legal fees which Herman owed Dodd in association with another suit; Dodd received a signed handwritten receipt, which is in the record.
As a part of his defense, Dodd presented affidavits or testimony of a number of judges and attorneys who knew him. Each stated that his general reputation is good or excellent, that his reputation for truth and veracity is good or excellent, and those who testified stated they would believe him under oath even if he were interested in the outcome.
 DECISION
We, as the triers of fact, must decide who to believe and who not to believe. Guilt must be proven by a preponderance of the evidence. It cannot be established by testimony of doubtful character ". . . when . . . the evidence leaves the fact in a state of doubt and uncertainty, it cannot be regarded as established". In re Carroll, supra, 287 Ala. at 36,247 So.2d at 355.
The credibility of Doris is low. Her interest in Kathy's injury appears to be more in what it was worth to her, than in any concern she has over Kathy being compensated for her injury, or for that matter, over the health of Kathy. *Page 706 
As to Dodd's alleged settling of the law suit without Doris's knowledge and consent, we tend to believe Dodd over Doris and Jerry Wayne Shew. This is supported by Nancy's testimony that Doris, while with her and Kathy outside of Herman's presence, had earlier stated she wanted Kathy to receive everything because she is the one who had suffered. Moreover, Doris did not have a valid claim individually.
However, as to the rewriting of the contract, Dodd's credibility is low. He originally believed he had a right to consider Kathy as a new client upon the removal of her disability of non-age. Dodd does not now argue that he had that right, but rather that there was no real difference between the first and second contracts.
As to the legal relationship between Dodd and Kathy under the first contract signed by her mother as next friend, see Smootv. Ryan, 187 Ala. 396, 65 So. 828 (1914); Wiggins Estate Co. v.Jeffery, 246 Ala. 183, 19 So.2d 769 (1944); Power of guardian ad litem or next friend to bind infant by his contract with attorney fixing compensation, 7 A.L.R. 108; Liability of infant for attorney's services in personal injury actions, 7 A.L.R. 1011. Dodd was bound by the first contract. We need not decide whether Kathy was. In either case, Dodd could have been in doubt and have legitimately sought confirmation upon the removal of Kathy's disability of non-age without offering further consideration. Sims v. Gunter, 201 Ala. 286, 78 So. 62
(1918).
The critical question is whether Dodd increased his fee in the second contract. Kathy does not profess to know what the terms of the first contract were. While Dodd asserts here that the first contract provided for a 50% contingency fee if filed, and there was consequently no change because suit was filed, his testimony before the Grievance Committee indicates that his objective was not merely to get a confirmation of the first contract, but to get the best contract with Kathy that he could. The Board in brief notes that most witnesses do not intentionally lie. "Witnesses frequently, honestly, state the facts inaccurately. Witnesses will honestly remember what they want to remember." We do not believe that Dodd was intentionally lying. However, we seriously question whether Dodd's memory is providing the true terms of the first contract. We conclude that a preponderance of the evidence shows that the second contract was an increase over the first, though we are not clear on the exact terms of the first contract.
The remaining question raised is whether a finding of guilty for failing to carry out the first contract is inconsistent with a finding of not guilty as to the other counts (see footnote 1).
 "Only where substantially the same facts constituting a single course of conduct are alleged as violations of two separate rules, does the finding of not guilty as to one preclude a finding of guilty as to the other." In re Board of Commissioners of Alabama State Bar v. Jones, supra, 291 Ala. at 376, 281 So.2d at 271.
A finding of guilty as to Count IV (regarding the contracts) requires a finding of fact different from that required in a finding of innocent as to the other counts.
We decline the respondent's invitation to review Dodd's innocence as to Counts I, II and V. We conclude that Dodd is guilty of Count IV and not guilty of Count III. Hence, we reduce the 60 day suspension to 30 days.
AFFIRMED IN PART; REVERSED IN PART; AND JUDGMENT RENDERED.
BLOODWORTH, MADDOX, ALMON, SHORES, EMBRY and BEATTY, JJ., concur.
TORBERT, C.J., recuses self.
[1] The substance of Charge I is that Dodd violated Disciplinary Rule 1-102 (A)(4) by obtaining the signature of Doris Myers on a "Petition for the Removal of the Disability of Nonage" of Kathy by deceiving Mrs. Myers into believing that she was signing something else. Rule 1-102 (A)(4) reads:
"DR 1-102 Misconduct.
"(A) A lawyer shall not:
. . . . .
"(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation, nor be guilty of willful misconduct."
The substance of Charge II is that Dodd, after having Kathy's Disability of Nonage removed, caused Kathy to enter into an employment contract with Dodd without the knowledge or consent of her mother, Doris Myers, again in violation of DR 1-102 (A)(4).
Charge V alleges violation of DR 1-102 (A)(5) and (6). Dodd is alleged to have offered Doris Myers $150.00 in return for withdrawal of her complaint to the Grievance Committee. DR 1-102 (A)(5) and (6) read as follows:
"DR 1-102 Misconduct.
"(A) A lawyer shall not: . . .
"(5) Engage in conduct that is prejudicial to the administration of justice.
"(6) Engage in any other conduct that adversely reflects on his fitness to practice law."
[2] Herman Myers was Doris' third husband. She had one child, Nancy, age 34, by her first marriage to Rhodes, nine by her second marriage to Shew (Janice, 29; Peggy, 26; Jimmy, 27; Kenneth, 24; Kathy, 19; Allen, 18; Toni Lynn, 14; Jerry, 17) and 1 son, Herman, by her third marriage to Herman Myers. She married Myers in 1961. *Page 707